**ATLAS MINI STORAGE, INC.,**
**Plaintiff–Appellant,**

**v.**

**FIRST INTERSTATE BANK OF DES MOINES, N.A. and American Steel Building Company, Inc., Defendants–Appellees.**

**No. 87–567.**

Court of Appeals of Iowa.

May 31, 1988.

As Amended June 29, 1988.

John R. Mackaman of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for plaintiff-appellant.

Donald A. Wine of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, for defendant-appellee American Steel.

Randall Horstmann of Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, for defendant-appellee bank.

Heard by HAYDEN, P.J., and SACKETT and HABHAB, JJ.

HABHAB, Judge.

In this equity action the plaintiff-appellant Atlas Mini Storage, Inc. (Atlas) sought a temporary and permanent injunction restraining defendant-appellee American Steel Building Company, Inc. (American Steel) from presenting and First Interstate Bank of Des Moines, N.A. (Bank) from honoring a draft drawn on a letter of credit issued by Bank for the benefit of American Steel. The trial court determined that Atlas was not entitled to a temporary injunction. We reverse.

A brief history of facts is necessary for a better understanding of this dispute. American Steel (headquartered in Houston, Texas), as contractor, and Atlas, as owner, on October 15, 1986, entered into a written construction agreement whereby American Steel agreed to furnish and erect fifteen mini storage buildings for Atlas in Des Moines, Iowa. As a part of that agreement, Atlas through the Bank furnished a letter of credit for the benefit of American Steel. The letter of credit, in pertinent part, provides:

> Drafts must be accompanied by a copy of a commercial invoice together with a signed statement by an officer of American Steel Building Co., Inc. stating that the original invoice has not been paid, and that the invoices are beyond forty (40) days of invoice date.

On February 5, 1987, Atlas wrote to American Steel and informed them that because of "negative changes in the competitive forces in the mini-storage market" they were cancelling the October 15 contract. Atlas additionally requested the return of the letter of credit.

On February 12, 1987, American Steel sent to Atlas a document it denoted as "invoice" which provided:

CANCELLATION OF CONTRACT PER MRS. HELEN P. HART'S LETTER OF FEBRUARY 5, 1987.
AMOUNT                $94,020.00
  LESS: PAYMENT RECEIVED 10–22– 86  −2,765.32
BALANCE DUE          $91,254.68

(At the temporary injunction hearing, an American Steel witness testified that the amount was "for the benefit of bargain that we would have received had this con-

tract been performed.") The amount claimed to be owed remains unpaid.

Prior to the expiration of the forty days when a draft could be made upon the Bank for payment under the letter of credit, plaintiff obtained a temporary injunction against the Bank and American Steel restraining them from "honoring or requiring the honoring of any draft ..." under the letter of credit. American Steel subsequently prevailed on a motion to dissolve the temporary injunction. It is this decision which we review de novo.

I.

This dispute centers around whether the document submitted by American Steel and identified as an invoice is a "commercial invoice" within the meaning of the letter of credit. Except insofar as that document has bearing on whether the temporary writ of injunction should issue, we are not called upon at this time to interpret its meaning. However, it is inescapable that we touch briefly on certain parts of the law concerning letters of credit.

A standby credit is described by Professor John F. Dolan:

> Sometime after World War II, the standby credit became an important commercial device. It is now used in a significant number of settings and could well grow in use as more lawyers and industries become familiar with it. The standby credit lends itself readily to domestic transactions where one party's performance extends over a period of time.... While the obligor is performing or preparing to perform, the promisee who awaits that performance has the benefit of a separate promise (from the issuer) that, if the account party defaults, the issuer will pay the beneficiary money. The standby credit closely resembles a performance bond, but differs from such a bond in that it substitutes the quick payment of funds for the surety's promise of performance.

John F. Dolan, *The Law of Letters of Credit* § 3.06, at 3–21 (1984).

From this description, we learn that the promise of the issuing bank is independent

of the contractual agreement of the primary parties. As our supreme court stated in *First Nat. Bank, etc. v. Rosebud H. Authority*, 291 N.W.2d 41 (Iowa 1980):

> The key to the commercial vitality and function of a letter of credit is that the issuing bank's promise is independent of the underlying contracts, and the bank should not resort to them in interpreting a letter of credit.

*Id.* at 44.

Recognizing that the issuing bank's promise is independent of the underlying contract, the respective parties build into their agreement a careful description of the event that will trigger payment. Rowland at page 44. In the case before us, before payment is made by the Bank "Drafts must be accompanied by a copy of a commercial invoice...."

As it relates to "commercial invoice," we note for the purposes of this appeal the following from Dolan:

> The commercial invoice is a document describing the goods that is prepared by the seller. It sets forth the product charges and usually the insurance and shipping costs. It is a well-established principle of letter-of-credit law that the description of the goods in the commercial invoice must comply with the description in the credit itself, and the careful seller will track the credit language in his invoice. The purpose of the invoice, by forcing that requirement on the seller, is to give the bank an express warranty from the seller that it has complied with the credit, but it is not so much to insure that, in fact, the seller shipped conforming goods....
>
> The description of the goods in the invoice assists in the identification of the specific credit, and is a further representation by the seller that the amount of the draft is justified and that the amount of insurance coverage is adequate. Finally, the description of the goods in the invoice serves as a benchmark for the more general descriptions of the goods in other documents.

John F. Dolan, *The Law of Letters of Credit* 1-23 & 1-24 (1984).

American Steel takes the position that the document which accompanied their draft is a commercial invoice; therefore, they claim they are entitled to payment from the issuing bank. Atlas, however, claims that the document is not even an invoice, let alone a commercial invoice; Atlas argues further that it is nothing more than a claim for estimated damages for breach of contract.

This is the dilemma that faces the Bank. The law requires the Bank to "examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit...." Iowa Code § 554.5109(2) (1987); *see Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 886 (3rd Cir.1977) ("Both parties are held to a standard of strict compliance—in the absence of conformity, the beneficiary cannot force payment and the bank pays at its peril.") As the court in *Rosebud* stated:

> If courts deviate from the rule of strict compliance and insist in certain undefined situations that banks made payments notwithstanding the fact that the beneficiary failed to comply with the terms stipulated in the letter of credit, the certainty that makes this device so attractive and useful may well be undermined, with the result that banks may become reluctant to assume the additional risks of litigation.

*Rosebud*, 291 N.W.2d at 45 (citing *Insurance Company of North America v. Heritage Bank*, 595 F.2d 171, 176 (3d Cir.1979)).

■ We have already noted the principle of law that a letter of credit is an independent promise and that banks should not resort to the underlying contract to interpret the letter of credit. But here the dispute rests more on whether the terms of the letter of credit have been complied with, i.e., whether the document that accompanied the draft is a commercial invoice. Thus, insofar as the Bank is concerned, the doctrine of strict compliance comes into play.

■ The appellee contends that since Atlas unilaterally cancelled the contract and because of its rights under the letter of

credit, it should hold the funds pending the outcome of the controversy. But, in this respect, it cannot go unnoticed that the appellee has unilaterally determined its measure of damages and fixed its own amount. We concur with appellee that the letter of credit should not be returned to Atlas, but conclude that the funds should be held by the Bank until this matter is finally resolved. The appellee in his brief states, and we agree, that the issue here is "... which party should hold the money pending the outcome of the dispute."

### II.

We turn to the question of whether plaintiff is entitled to injunctive relief. Iowa Rule of Civil Procedure 321 states: "A temporary injunction may be allowed: (a) when the petition, supported by affidavit, shows the plaintiff is entitled to relief which includes restraining the commission or continuance of some act which would greatly or irreparably injure him...."

"A [preliminary] injunction should not be granted unless the movant has established a fairly reliable basis therefore." 7 J. Moore, Moore's Federal Practice § 65.04(4) at 65–65 (2nd ed. 1985). The plaintiff, the moving party, has the burden to establish a factual basis for its issuance. The court in *Kleman v. Charles City Police Dep't,* 373 N.W.2d 90, 95 (Iowa 1985), stated:

> The type of evidence which a court may properly consider in determining whether to grant an injunction depends on whether the injunctive relief requested is temporary or permanent in character. Under our procedural rules, permanent injunctions are those granted as part of a final judgment, while temporary injunc-

tions are those granted at any prior stage of the proceedings. Iowa R.Civ.P. 320. A temporary injunction is a preventive remedy to maintain the status quo of the parties prior to final judgment and to protect the subject of the litigation. *Kent Products v. Hoegh,* 245 Iowa 205, 214, 61 N.W.2d 711, 716 (1952).

> Rules of evidence are applied more strictly on final hearing of a cause than on an application for temporary injunction, when evidence that would not be competent to support a perpetual injunction may properly be considered. *See* Iowa R.Civ.P. 321 (affidavits may be considered in determining whether a temporary injunction may be allowed); Iowa R.Evid. 1101(a) (Iowa rules of evidence apply in all court proceedings except as otherwise provided by statute or court rules). *See generally* 1 J. Wigmore, Evidence § 4(4) at 42–45 (P. Tillers rev. ed. 1983); 42 Am.Jur.2d *Injunctions* §§ 285–87 (1969); 43A C.J.S. *Injunctions* §§ 211–17 (1978).

*Id.*

We conclude that the plaintiff has met its burden entitling it to temporary injunctive relief. This cause is remanded with instructions to continue the temporary injunction with bond fixed by the trial court pending the resolution of this dispute on its merits by the trial court.

REVERSED AND REMANDED.